Thank you, Your Honor. May it please the Court, good morning. I'm Sharon Rudnick, and I represent the defendants in this case, Providence Health Plan. Providence Health Plan exercised its discretion under the plan at issue here to deny plaintiffs' preauthorization request for blood-brain-barrier-disruption-enhanced intra-arterial chemotherapy. Just the last particular form of brain tumor. Providence determined that under its plan, in interpreting its contract, that the treatment fell within the experimental investigational exclusion of plaintiff's policy. The district court determined that the decision, that the plan committed such significant procedural violations that it could review that decision de novo and decided that the plan should have covered the entire protocol. The district court made two significant errors here. First, the district court correctly determined that the plan gave Providence the discretion to interpret the plan and determine benefits. But then it erred when it reviewed Providence's discretionary determination for de novo rather than for abusive discretion. And then the district court also erred when it concluded Providence on reconsideration without conducting appropriate analysis that Providence abused its discretion in denying the claim because some of the components of that treatment would be covered if used as part of an entirely different treatment. Let me ask you about that last point. Okay. Should it be obvious to someone that some parts of the BBD protocol are covered, are normal chemotherapy-type coverage, and that they would be covered under Providence's normal plan? So that's, I think, Dr. Newalt says subsequently in his memo. No. Because the fundamental misunderstanding of the court on reconsideration when the court considered that question is that the whole object here is getting chemotherapy to the brain tumor. Chemotherapy is a drug. There are many kinds. There are different protocols for accomplishing that effect, from getting the drug to the brain tumor. Standard chemotherapy is a treatment that, as the record shows, despite Dr. Newalt's declaration, is sometimes even an outpatient treatment, and it's intravenous chemotherapy. Blood-brain barrier disruption-enhanced chemotherapy is an entirely different protocol, an entirely different treatment plan that has the same objective. No. But does that mean that the chemotherapy part is an entirely different form of treatment than the, I'll call it the standard kind? Yes. The drug Does the record confirm that it's an entirely different type of treatment? Yes. Yes. In fact In what way is it different? The what is the same is that the objective is to get a chemotherapy drug to the brain tumor. But the way it is different is that when in standard chemotherapy, the record shows that the chemotherapy is often given intravenously, not arterially, and is the evidence that Dr. Newalt put in No. But when you say often given intravenously, does that mean that's the only kind that's considered treatment? Well, what kind of chemotherapy was given here in this case? This was This was a three- or four-day process whereby a drug was given to disrupt the blood-brain barrier. Chemotherapy No. I'm just talking about the chemotherapy part. What kind of chemotherapy was given in this case? Well, but the chemo The drug given here, there were two chemotherapy drugs, and different chemotherapy drugs can be given in different protocols. But the point here is, is that the process that the process by which a drug is delivered to the brain is entirely different. That's the treatment that is being covered. Because there is a covered treatment that might involve the same drug doesn't mean that they should have to pay for the drug So far you've just given me conclusions. You're not telling me exactly what was given in the way of chemotherapy in this case. They gave the They gave two drugs, methotrexate and casparin, I think the standard is. And gave it how? Gave it intra-arterially after a treatment of blood-brain barrier disruption. Now, so is that inter-arterial treatment of this, these two chemicals, not covered by the plan, if it were given separately? Is that what you're saying? I'm saying that if it were given under a different treatment protocol, it might have been covered. Given under this treatment protocol, it is the treatment protocol that is the issue here, because it's as if you're under But the part of the protocol that's different is this blood barrier business, right? No, what's different is not only the blood barrier disruption, but the way the chemotherapy reaches the brain and the risks that are attendant with that, that are experimental What do you mean by the way it reaches the brain? I mean, does the plans, you know, whether it's covered or not, make a difference as to the way it reaches the brain? Yes. Is that because there's a blood barrier disruption? Yes. All right, so without the blood barrier disruption, it would, you know, you still try to reach the brain, right? Yes. You want the chemotherapy to reach the tumor. Again, what's the difference in the chemotherapy part? If you put aside the blood barrier disruption? You can't put aside the blood barrier disruption, Your Honor, that's the point. The point is that there are two, these are two different treatment protocols to accomplish the same result. You can't put aside the blood brain barrier disruption, and the key point here is that it was Providence's discretion to determine how to interpret the plan, how to interpret what's experimental and investigational, and they view this protocol as a treatment protocol different from standard chemotherapy, and where the district court The question that Judge Tashima was asking you is, draws the practical, factual differences between the use of chemotherapy in the BBD treatment and the standard treatment. We know that in the standard treatment, you don't get BBBD. Correct. Are you saying that there's another difference, that under standard treatment, it can be an outpatient procedure, it can be introduced intravenously instead of inter-arterially? Yes. And that is in the record, in the information that Dr. Neuert submitted from other doctors commenting on the procedure. Providence interpreted the plan to not cover that process. Now, if it's inter-arterially, is hospital stay required? Under BBBD, it is a several-day hospital stay. Under standard chemotherapy, the record shows that it is sometimes, it is not always hospitalization. It depends on how the patient tolerates the chemotherapy. So, an expert looking at this request that was made originally by her husband and her doctor wouldn't see this is a request for chemotherapy with this additional procedure, the BBBD procedure. That's not a reasonable way to view this request, is that what you're saying? Correct. Because the BBBD enhancement changes both the risks, the potential risks, and the potential benefits of the treatment. So in analyzing whether a treatment is efficacious, if it is safe, what its toxicity is, it is an entirely different analysis than the analysis of standard chemotherapy. And Providence exercises discretion to say that this process, this treatment protocol for delivering the chemotherapy to the brain was experimental and investigational. And the district court determined that it, that Providence had engaged in procedural errors that allowed the district court to review the decision de novo, and that's where the district court went wrong. Can you address the procedural errors briefly? The opposing counsel suggests that Dr. Korn essentially was, I think that was his name, was involved in every level of decision-making. And that is not correct, Your Honor. The regulations require two things of Providence. They require that the person who made the initial adverse benefit decision, and that's the person here who made the preauthorization decision. And that was Dr. McKay? And that was Dr. McKay. And that evidence is undisputed. He has an undisputed affidavit in the record saying, I made that decision. That person cannot be involved in any of the levels of appeal. And by the way, only one level of appeal is required. Here there were three. And the evidence is undisputed that Dr. McKay was not involved in any other level, any of the levels of appeal. Additionally, the regulations require that in a decision of this type, the plan has to be considered for the initial benefit determination. Here there was no expert consulted in the initial expert, the initial determination. That determination was made in August. The first expert, outside expert opinion was received in September. But here Providence talked to three, got opinions from three separate board-certified oncologists. And so they completely complied with the regulations. So I think they were suggesting that Dr. McKay got input from Lewis, Dr. Lewis, and then Dr. Lewis subsequently gave information at another level of appeal. And that's impossible on this record, Your Honor, because the preauthorization and the reconsideration request were both denied in August. And Dr. Lewis's opinion was received on September 7th, 2007. So it's impossible on this record that that is true. The problem here is that the district court read the regulations to mean that people can the same people cannot be involved on different levels of appeal. And that's simply not the case here. It is undisputed on this record that the people involved in making the initial benefit determination were simply not involved in appeal and that the that the plan got the appropriate level of appeal. Now, outside opinions. Now, what the district court did on reconsideration in finding that there would be no that there was an abuse of discretion is that he didn't apply the appropriate abuse of discretion standard. He didn't look at the contractual, the plan definition of investigational experimental and determine whether Providence's decision was reasonable, meaning that it wasn't implausible, it wasn't impossible, it wasn't illogical, and it wasn't and it was supported by the inferences from the record. And if you apply the appropriate abuse of discretion standard here on this record, particularly when you limit yourself to the administrative record, which is appropriate here, which the district court did not do, there's only one conclusion, which is Providence didn't abuse its discretion. And if I may, I'd like to save my two minutes for rebuttal. Thank you. May it please the Court, counsel. My name is Megan Glorin. I represent the plaintiff in this matter, Joan Lafferty. I'd like to start with the regulations since that's obvious to me. There's a lot of interest in the questioning. And I think Providence's assertion that this requirement of independence at each level is not in the regulations, was not a requirement in this case, is misplaced. There are two reasons. The first reason is that Providence's own plan is very clear, and this is at ER 212. The second reason is that Providence's own plan is very clear, and this is at ER 212. The third reason is that Providence's own plan is very clear, and this is at ER 212. What's in the plan is not the same as what's in the regulation. Excuse me? I said what's in the plan is not the same as what's in the regulation. No, it's not. But it's not precisely the same. I believe that they are functional equivalents. But Providence commits a procedural violation. So you're saying a violation of the plan is per se a violation of the regulation? A violation of the – Providence's failure to impose or adhere to its own internal processes is a violation of the regulation. Which regulation? The section is B-5, and I'm sorry, I don't have the – I can pull the regulation, but I didn't bring it up here in front of me. And that's precisely what Providence has done in this case. ER 212 makes very clear that at the first level of appeal and at the second level of appeal, the appeal must be reviewed by Providence health plan staff not involved in the initial grievance, not involved. And in this case, at the initial grievance level, the record makes clear that there was – Counsel, I thought that Dr. McKay was the one who made the initial determination that this was an investigational procedure. I believe that – Now, you say that there's a violation of Providence's own plan, which eliminates first level and second level involvement by the same persons. Who other than Dr. McKay, do you say, made the initial determination? There – perhaps we have our words mixed up. The initial determination was the decision on the prior authorization request. The decision I'm speaking of, and that was the decision that was – I believe the record supports that Dr. Lewis, Stacy Lewis, participated in that decision because Dr. McKay expressly requested that she do so. But nevertheless, even putting that aside – did you want me to stop there? No, no. Okay. I'm trying to understand you. You tend to speak very quickly and jump from one issue to the other. Now, let me ask you this. What do you call the first level? The first – Is that Dr. – the pre-authorization? The first decision was the pre-authorization decision. And then there was a review of that decision. Now, you're saying that the first decision was made by Dr. McKay, but we should not consider that because the question is whether they violated their own plan in the first level and the second level of appeal. Is that right? Not precisely. Let me try to make it very easy. We have a pre-authorization denial. Right. Providence's internal regulations do not speak to that level. It is the next level that Providence's rules speak to, and that is the initial grievance level. The initial grievance level – The initial grievance level. Correct. The denial of the initial grievance was issued on September 26, 2007. But that's a second – that's a second decision in terms of the regulation. That is the second decision in terms of the regulations. That's correct. Nurse Buell and Dr. Korn participated at that level. Dr. Lewis also had participation at that level because her conclusion was considered in denying the initial grievance. Now, when we move to the next level of appeal after the initial grievance, that is the first level appeal. Now, let me ask my question again. How does this Providence system violate the regulations? Providence's system violates the regulations in two ways. First of all, it is a violation of the regulations for Providence to fail to comply with its own internal guidelines. And that is established in Section 2560.503-1, 29 CFR, Section B-5. It requires the plan to establish and maintain reasonable – How does it violate the plan – the plan's own regulations? Excuse me? How does the process used in this case violate the plan's own requirements? It violates the plan's own requirement because – requirements because the plan requires that there be – that the decision-makers involved at the first level of appeal and the second level of appeal. That's Korn, Newell, and Lewis. That's the Buell – Pardon me, counsel. I'm sorry. Let's go slowly. Calm down. I'm trying. You're saying that the plan requires that at the first level of appeal, the plan requires at the first level of appeal, the persons involved with making that determination no longer be involved at the second level of – is that what you're saying? I'm saying that the people who are involved at the first level of appeal must not have been involved at the initial grievance. Not the prior authorization, but if you will, in this scenario, level two. What is odd about their regulations, about their own internal rules – What is odd about this argument is that you keep bouncing around different – let's go chronologically. The first action of the plan was the pre-authorization decision. That was taken by Dr. McKay. True? True, and addition, no requirement in Providence's plan provisions as to that denial. Okay. Now, the first level of appeal is Dr. Korn, Nurse Newell, and Dr. Lewis. Correct. Initial grievance, we call it. Was that okay as far as the plan's own regulations? Yes. All right. Now, what you're complaining about is that there's a second level of appeal in the grievance process. Which is called the first level appeal, oddly. All right. At that level of appeal, we had participation by Nurse Buell, who sent the form to Dr. Keck at ER 86. So this was Dr. Keck's determination, according to my notes. And I know that your brief disputed that and had some language about how, well, it doesn't say, and there was the wrong title or whatever, but there was an affidavit saying that it was Dr. Keck who did that. So if Dr. Keck made the decision, is that a problem with the plan? Is that inconsistent with the plan? Dr. Keck, independent of other facts in this case, that would not be a problem, because Dr. Keck did not participate at that initial grievance level. However, the record is clear. Nurse Buell sent forms to Dr. Keck, recited the prior conclusions, provided, selected which documents Dr. Keck would review, and then he reached his conclusion. The other issue is that Nurse Buell sits on what's referred to as the QMM, which actually issued the denial letter on this claim. Isn't that just an administrative, you know, bureaucratic unit, the QMM? The record does not support that. The record supports that the function of Providence's staff at those levels, these were the only medical people. Nurse Buell and Dr. Korn were the only medical people advising the QMM, and that's what their role was. Their role was to provide technical assistance and to advise. But nevertheless, Providence's regulations rules specifically say this has to be these levels of appeal, the first and second, have to be performed by people who were not involved in the initial grievance. And that is a very, that is a high standard. And that is not involved clearly means, I believe clearly means did not participate, did not take any role. And Providence could have said did not take part in the final, could have qualified this in many ways, but did not. The same problem occurs at the second level of appeal where the grievance committee, which is composed of four laypersons plus Dr. Korn and Nurse Buell as advisors providing the technical information, also participated. Dr. Korn advised the grievance committee. That's established at the record at 22 and in the supplemental record at 11. He advised the grievance committee. Another problem, underscoring this problem, is there are no minutes of this committee. What we have here in this case is rubber stamping after rubber stamping of decisions. A check box, experimental, four words, 12 words, 11 words, experimental. There's no reasoning. There's no solid basis for these decisions over and over again by Providence's medical staff. And when you have that combination of the same individuals participating repeatedly at subsequent levels of appeal combined with bald-faced conclusions, that is very problematic and is what led this judge, this district court judge, to conclude that Providence had flagrantly violated both the plan and ERISA's regulations. You only have, I see, four minutes left. Could you respond to the plan's argument about, you know, even the chemotherapy part of this treatment not being covered by the plan? Certainly. There is, if I may, one more point that won't take more than 30 seconds on this issue of the procedural violations, and that is that Providence cited a number of cases that speak to not issued by this court and not binding on this court that speak to independence at subsequent levels. There is a ‑‑ the Secretary of Labor has spoken on this issue in a set of frequently asked questions that appear on the Secretary's website that I learned of last night. There is a ‑‑ Don't spend your time on that. Spend your time, answer the question that Judge Toshima asked you. Certainly. I believe that that D3 question responds to ‑‑ Frequently asked questions are not regulations, and they haven't been subjected to public comment in the way that you think they have. Answer Judge Toshima's question. Certainly. As to the specific procedures that were used here, first of all, Providence knew precisely which procedures were being requested because they were presented in itemized statements in Dr. Newell's affidavit ‑‑ excuse me, letter, and then subsequently in his affidavits. The record shows that these procedures would have been substantially the same, including the interarterial chemotherapy, had the BBBD treatment not been used, and that is explained clearly in the supplemental record at supplemental ER at page 194, paragraph 8. 194?  Okay. Go ahead. Paragraph 8. There are also numerous statements in the materials that supported the appeal that specifically mention interarterial chemotherapy. There is, and to the contrary, Providence's succession of denials do not discuss, do not assert, and do not provide support for the fact that interarterial chemotherapy is not the norm. So ‑‑ And did your client ‑‑ I understand your client didn't request. There was never any request made for partial coverage, or am I misunderstanding? I believe that the initial request was submitted by the hospital because of her critical condition. The initial request was for interarterial chemotherapy with BBBD. Now, Providence would like to ‑‑ we can argue about how those words should be interpreted, but a protocol was submitted with that that itemized every element. And at the end of the day, when we review this decision, whether it's reviewed de novo or for an abuse of discretion, the plan makes absolutely clear that every item, every procedure is unequivocally covered, except for the BBBD disruption itself, the mannitol, which is a very inexpensive, a very minor part of this procedure. And so the procedure would have been done exactly the same with or without the BBBD? Precisely. And the citation that I've given you to Dr. Newell's affidavit establishes that. What's the citation? The 194 paragraph 8? That is not the only ‑‑ there are other references in the voluminous materials he submitted that discuss IA chemotherapy, and most notably, and I'm sorry, I don't have this citation in my head. You agree that a different risk is created under BBBD than from traditional chemotherapy, correct? Correct. And I believe that the record establishes unequivocally that the risk of this therapy was within the safety standards in the practice of medicine, and Dr. Newell's affidavit and the materials establish that. You have two minutes. And I just want to make three points, Your Honor. First of all, when the preauthorization request was made and denied and then appealed, the plaintiff expressly said that she did not want standard chemotherapy treatment, that she wanted this separate BBD enhanced chemotherapy because she didn't ‑‑ she didn't want to risk cognitive effects of standard chemotherapy, and she thought her survival rate or her recovery rate was better with the different treatment. Can you give us a record citation to that? I can't off the top of my head, Your Honor. It's in the ‑‑ it's in her letter at the first level of appeal. Ms. Lafferty wrote a letter herself to the grievance committee that laid out her reasons for it, and that's where it is. It's in the stipulated record. Second of all, this issue of whether the plan abused its discretion or acted wrongly by not covering component parts of this treatment wasn't part of the administrative record. It only came up on appeal. And if you appropriately limit the district court to the administrative record, which is appropriate under an abuse of discretion standard, particularly where there was ample opportunity to develop the record, to respond where all information and doctor's opinions were on the table, this is ‑‑ Well, except you admit the minutes of the meeting are pretty sparse, right? There's almost ‑‑ there's nothing there. You don't know what they decided or why. But all of ‑‑ well, all of the record is there, and there is a detailed response from the grievance committee from legal counsel in the record that explains exactly why the grievance committee decided what it decided in great detail. So there is not much ‑‑ which leads me to my second point. There is no rubber stamping here. This was a full and fair review that complied with the regulations. The regulation that Ms. McClure cites where she claims Providence didn't follow its own procedures and that becomes an ERISA violation says the claims procedures must contain ‑‑ claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with government plan documents and that where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants. That says nothing about making an inconsequential violation of an internal procedure an ERISA violation, never mind a significant enough ERISA violation to shift the standard of review to de novo. Thank you. Thank you very much. Thank you, counsel, for an interesting presentation. And that will conclude our ‑‑ the case of Lafferty v. Providence is submitted. That will conclude our calendar and take more morning at 9 o'clock.
judges: Tashima, Bea, Ikuta